## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

BETTY H. LEFTWICH,               )
                                 )
                Plaintiff,       )
                                 )
        v.                       )          1:13CV00414
                                 )
CAROLYN W. COLVIN,               )
Acting Commissioner of Social    )
Security,                        )
                                 )
                Defendant.       )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Betty H. Leftwich, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Commissioner of Social Security, denying Plaintiff's claim for Disability Insurance Benefits ("DIB"). (Docket Entry 2.) The Court has before it the certified administrative record (cited herein as "Tr. __"), as well as the parties' cross-motions for judgment (Docket Entries 10, 14). For the reasons that follow, the Court should remand this matter for further administrative proceedings.

## I. PROCEDURAL HISTORY

Plaintiff applied for DIB, alleging a disability onset date of May 1, 2009. (Tr. 121-24.) Upon denial of that application initially (Tr. 70, 72-75) and on reconsideration (Tr. 71, 81-88), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 89-90). Plaintiff and her attorney attended the

hearing. (Tr. 45-60.) The ALJ subsequently determined that Plaintiff did not qualify as disabled under the Act. (Tr. 19-39.) The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-6), making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings later adopted by the Commissioner:

> 1. [Plaintiff] meets the insured status requirements of the . . . Act through December 31, 2012.
>
> 2. [Plaintiff] has not engaged in substantial gainful activity since May 1, 2009, the alleged onset date.
>
> 3. [Plaintiff] has the following severe impairments: degenerative disc disease, cervical kyphosis, borderline intellectual functioning, mood disorders, and anxiety-related disorders.
>
> . . .
>
> 4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.
>
> . . .
>
> 5. . . . [Plaintiff] has the residual functional capacity to perform medium work . . . except she can only occasionally climb ropes, ladders or scaffolds and must avoid concentrated exposure to workplace hazards such as heights and machinery. . . . [Plaintiff] has the mental residual functional capacity to understand and remember simple three-step directions, to sustain sufficient attention to complete simple routine tasks for a two-hour period, to accept direction from a supervisor and maintain adequate relationships with co-workers in work settings with no demand for extensive social interaction, to work in an environment not requiring work with the general public, to adapt to change, and to function with a stable work assignment.

2

. . .

6.    [Plaintiff] is unable to perform any past relevant work.

. . .

10.  . . . [T]here are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform.

. . . .

11. [Plaintiff] has not been under a disability, as defined in the . . . Act, from May 1, 2009, through the date of this decision.

(Tr. 24-39 (internal parenthetical citations omitted).)

## II.  DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits."  Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006).  However, "the scope of [the Court's] review of [such a] decision . . . is extremely limited."  Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). Even given those limitations, the Court should remand this case for further administrative proceedings.

## A.  Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).  Instead, the Court "must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal

3

standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Social Security Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Social Security Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based

4

upon a correct application of the relevant law." <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," <u>Hall v. Harris</u>, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" <u>id.</u> (quoting 42 U.S.C. § 423(d)(1)(A)).[1] "To regularize the adjudicative process, the Social Security Administration has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." <u>Id.</u> "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." <u>Id.</u> (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial

---

[1] The Act "comprises two disability benefits programs. [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed. Supplemental Security Income . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." <u>Craig</u>, 76 F.3d at 589 n.1 (internal citations omitted).

5

gainful activity,' *i.e.*, currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform [the claimant's] past work or (5) any other work." Albright v. Comm'r of the Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[2]  A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied.  The second step determines if the claimant is 'severely' disabled.  If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, the "claimant is disabled." Mastro, 270 F.3d at 177.  Alternatively, if a claimant clears steps one and two, but falters at step three, *i.e.*, "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[3]  Step four then requires the ALJ to assess

---

[2]  "Through the fourth step, the burden of production and proof is on the claimant.  If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

[3]  "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule"

6

whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[4]

## B. Assignments of Error

Plaintiff contends that the Court should overturn the ALJ's finding of no disability on these grounds:

---

(internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

[4] A claimant thus can establish disability via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

(1) "[t]he ALJ . . . improperly evaluated her mental impairment against Listing 12.05C for intellectual disability" (Docket Entry 11 at 4); and

(2) "[t]he ALJ improperly used the [Medical-Vocational Guidelines] to deny Plaintiff's claim where significant non-exertional impairments existed" (id. at 8).

Defendant contends otherwise and urges that substantial evidence supports the finding of no disability. (Docket Entry 15 at 3-20.)

1. **Listing 12.05C**

Plaintiff contends that the ALJ erred at step three of the SEP because he should have concluded that Plaintiff met subsection C of the mental retardation listing codified at 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 ("Listing 12.05"). (See Docket Entry 11 at 4-8.)[5] Plaintiff maintains that the ALJ improperly rejected her verbal IQ score of 70 resulting from the Wechsler Adult Intelligence Scale - Third Edition ("WAIS-III") administered by consultative examiners Dr. Patrick B. Sullivan and Courtney Zahner, M.A., on November 20, 2009. (See id. at 6 (citing Tr. 29); see also Tr. 243.) According to Plaintiff, the ALJ rejected that IQ

_____

[5] Effective September 3, 2013, the Social Security Administration replaced the term "mental retardation" with "intellectual disability" in its Listing of Impairments. See Change in Terminology: "Mental Retardation" to "Intellectual Disability", 78 Fed. Reg. 46499-01 (Aug. 1, 2013). Because this case commenced prior to the change and the ALJ utilized the old terminology, this Recommendation will use the term "mental retardation."

score "because there was an IQ score of 97 in [Plaintiff's] school records," but that the 97 IQ score "is a group IQ score, not an individual score for [Plaintiff]," "[t]here is no explanation of how it measured [Plaintiff's] individual intelligence," and "it is not expressed in terms of a verbal, performance or full scale score as required by [Listing 12.05C]." (Docket Entry 11 at 6 (citing Tr. 192).) Further, Plaintiff argues that her "terrible grades," her childhood achievement test scores, and letters from former coworkers and supervisors documenting her inability to read and write, establish that she suffered the requisite deficits in adaptive functioning "throughout her life." (Id. at 5-6 (citing Tr. 193-95, 200-06).) Finally, Plaintiff asserts that, because the ALJ found that she suffered from "several severe impairments" at step two of the SEP, she has shown she possessed other impairments that imposed additional and significant work-related limitations. (Id. at 5.) Plaintiff's arguments have merit.

In order to meet the requirements of Listing 12.05C, a claimant must demonstrate: 1) "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22" ("adaptive deficits"); 2) "[a] valid verbal, performance, or full scale IQ of 60 through 70"; and 3) "a physical or other mental impairment imposing an additional and significant

work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.05C.[6] In regard to adaptive deficits, Plaintiff must prove that she had those deficits both 1) during the developmental period, i.e., prior to age 22, and 2) during the subsequent period of alleged disability. See Hancock v. Astrue, 667 F.3d 470, 475 (4th Cir. 2012) (noting that "[e]ither finding alone," i.e., no adaptive deficits generally or no such deficits prior to age 22, "suffic[es] to support the conclusion that [the claimant] did not satisfy" Listing 12.05).

Although Listing 12.05C "does not expressly define 'deficits in adaptive functioning' . . . '[a]daptive activities' are described elsewhere in the [Mental Disorders] Listing . . . as 'cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office.'" Blancas v. Astrue, 690 F. Supp. 2d 464, 476 (W.D. Tex. 2010) (quoting 20 C.F.R. Pt. 404, Subpt. P, App'x 1, §§ 12.05 and 12.00(C)(1)); accord Hager v. Astrue, No. 2:09CV1357, 2011 WL 1299509, at *2 (S.D.W. Va. Mar. 31, 2011) (unpublished).[7]

---

[6] "In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, [the Commissioner] use[s] the lowest of these in conjunction with [Listing] 12.05." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00D.6.c.

[7] Similarly, a well-regarded treatise defines "adaptive functioning" as skills related to "communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, and safety." American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 41 (4th ed. text rev. 2007).

In discussing the components of Listing 12.05C, the ALJ found as follows:

> [T]he "paragraph C" criteria of [L]isting 12.05 are not met because [Plaintiff] <u>does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation</u> of function. [Plaintiff] earned a verbal IQ of 70 based on intelligence testing conducted on November 20, 2009 using the [WAIS-III]. Although the consultative examiners . . . indicated that this score was a "valid estimate of [Plaintiff's] current intellectual functioning" and stated that it was consistent with her premorbid functioning, her school records indicate that [Plaintiff's] IQ was 97. . . . [Plaintiff] earned poor grades and only completed the seventh grade. However, [Plaintiff's] school records also suggest that her conduct was rather poor, which certainly could have contributed to her academic difficulties. There is also no indication that she was in special education classes. In addition, the undersigned acknowledges that [Plaintiff] has difficulty reading and writing, but this limitation alone does not support a finding that [Plaintiff] meets the requirements of [L]isting 12.05. After all, [Plaintiff] is married, was able to raise a family, helps care for her parents, is able to drive, and successfully performed semiskilled work at the substantial gainful activity level for many years. Finally, the consultative examiners diagnosed [Plaintiff] with borderline intellectual functioning rather than mental retardation. All of these factors suggest that [Plaintiff] <u>did not manifest, prior to age 22, the adaptive deficits</u> that one would expect from a person whose mental impairment meets or medically equals the requirements of [L]isting 12.05.
>
> In further support of the above findings, the undersigned notes that the State agency psychological consultants . . . concluded that [Plaintiff's] mental impairments, including her borderline intellectual functioning, were severe but not of listing[] level severity. The undersigned gives these assessments significant weight

because they are consistent with the overall evidence of record.

(Tr. 29-30 (internal citations omitted) (emphasis added).)

Substantial evidence fails to support the ALJ's decision to reject Plaintiff's verbal IQ score of 70. In dismissing that IQ score, the ALJ relied solely on Plaintiff's IQ score of 97 from the California Test of Mental Maturity (Short Form) ("CTMM-SF") administered in January 1973 when Plaintiff was eight years old and in the second grade. (Tr. 29 (citing Tr. 192).) However, the ALJ's reliance on Plaintiff's 1973 IQ score from the CTMM-SF constitutes legal error for several reasons. First, the regulations make clear that, because "the results of IQ tests [generally] tend to stabilize by the age of 16," IQ test scores "obtained between the ages of 7 and 16" remain valid for only two years. 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 112.00D.10. Thus, Plaintiff's IQ score from the CTMM-SF in January 1973 remained a valid indication of her intellectual functioning only through January 1975 and should not have been relied upon by the ALJ as the sole basis to discredit the 2009 IQ scores obtained at the consultative examination.

Second, the regulations emphasize that "[s]tandardized intelligence test results are essential to the adjudication of all cases of intellectual disability." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00D.6.b. In turn, a "standardized psychological test" means "a psychological test measure that has appropriate

12

validity, reliability, and norms, and is <u>individually administered</u>
by a qualified specialist." <u>Id.</u>, § 12.00D.5.a; <u>see also</u> American
Psychiatric Ass'n, <u>Diagnostic & Statistical Manual of Mental
Disorders</u> 46 (4th ed. text rev. 2007) ("Individualized testing is
always required to make the diagnosis of [m]ental [r]etardation."").
In contrast, as Plaintiff argued (<u>see</u> Docket Entry 11 at 6; <u>see
also</u> Tr. 60), the CTMM-SF consists of a series of multiple-choice
questions <u>administrated in a group setting</u> to students, <u>see</u> <u>Thomas
v. Allen</u>, 614 F. Supp. 2d 1247, 1294 (N.D. Ala. 2009); <u>Hornick v.
Burough of Duryea</u>, 507 F. Supp. 1091, 1096 (M.D. Pa. 1980). The
above-described characteristics of the CTMM-SF render erroneous the
ALJ's reliance upon Plaintiff's CTMM-SF IQ score to disregard the
IQ score of 70 in the record.

Third, the record reveals no other apparent basis for
rejecting the validity of Plaintiff's verbal IQ score of 70.
Consultative examiner Dr. Sullivan administered the WAIS-III to
Plaintiff, which yielded a verbal IQ of 70 (borderline range), a
performance IQ of 80 (low average range), and a full-scale IQ of 73
(borderline range). (Tr. 243.) According to Dr. Sullivan, "[n]o
significant discrepancy" existed between Plaintiff's verbal and
performance IQs and Plaintiff "appeared to put forth good effort on
the evaluation and appeared to enjoy several of the tasks" and thus
the "obtained scores [were] a valid estimate of [Plaintiff's]
current intellectual functioning." (Tr. 245.) Dr. Sullivan

concluded that, "based on educational, vocational, and functional histories, [Plaintiff's] current intellectual functioning appears consistent with premorbid functioning and reflects longevity of functioning." (Id.) This examination by Dr. Sullivan thus met all of the regulatory requirements for deriving a valid IQ score: a standardized intelligence test with a mean of 100 and a standard deviation of 15 (WAIS-III), individually administered by a specialist, clinical observations by the specialist regarding Plaintiff's performance on the test, and assessment of the scores' validity and consistency with Plaintiff's functional limitations. See 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00D.5. The ALJ's dismissal of these regulatorily compliant psychological test results on the sole basis of a 1973 IQ score which lacks most of those regulatory criteria constitutes legal error.

Similarly, substantial evidence does not support the ALJ's conclusion that Plaintiff failed to establish deficits in adaptive functioning prior to age 22. (See Tr. 29.) The ALJ primarily relied upon Plaintiff's daily activities and work history to find a lack of adaptive deficits prior to age 22 (Tr. 29-30 (citing Tr. 48-58, 140-41, 148, 153, 160-61, 168, 197, 200-06, 207, 220, 230, 232-34, 241, 420, 429-30, 443, 459; G.P.O., Dictionary of Occupational Titles, No. 904.383-010 (Tractor-Trailer-Truck Driver), 1991 WL 687703 (4th ed. rev. 1991) ("DOT"))); however, almost none of this evidence relates to the time period prior to

14

Plaintiff's 22nd birthday (see Tr. 37 (reflecting Plaintiff's birth date), 140 (showing work income of $3,487.91 in 1984 and $6,728.83 in 1985 from unidentified sources that predated Plaintiff's 22nd birthday)). For example, although the ALJ found that Plaintiff "successfully performed semiskilled work at the substantial gainful activity level for many years" (Tr. 29), he cited almost exclusively to evidence relating to her prior work as a truck driver performed between 1992 and 2007 (see id. (citing Tr. 49, 140-41, 148, 153, 197, 200-06, 220; DOT No. 904.383-010, 1991 WL 687703)).

Further, the ALJ noted that Plaintiff "[was] married, was able to raise a family, help[ed] care for her parents, [and] "[was] able to drive" (Tr. 29), but relied on Plaintiff's hearing testimony in October 2011 (see Tr. 48, 50), her daughter's statements on a "Function Report - Adult - Third Party" completed in October 2009 (see Tr. 160-67), and various references to such activities in mental health treatment notes from 2009 to 2011 (see Tr. 220, 230, 232-34, 241, 420, 429-30, 443, 459), to make those findings. That evidence constitutes contemporaneous statements of Plaintiff's abilities, not accounts that relate back to the time period prior to her 22nd birthday. Moreover, the ALJ made no attempt at the hearing, beyond asking Plaintiff how far she had gone in school (Tr. 48), and whether she had obtained a graduate equivalency degree ("GED") (id.), to elicit testimony regarding Plaintiff's

15

abilities to communicate, care for herself, maintain a home, relate with others, or work prior to her 22nd birthday (see Tr. 48-58).

Compounding the ALJ's failure to properly elicit and consider evidence as to Plaintiff's functionality prior to age 22, the ALJ erred in evaluating Plaintiff's school records. (Tr. 29.) The ALJ acknowledged Plaintiff's "poor grades" and that she "only completed the seventh grade," but dismissed those considerations by noting that Plaintiff did not attend special education classes and that her "conduct was rather poor, which certainly could have contributed to her academic difficulties." (Id.) The absence of proof of special education and speculation that behavioral issues "could have contributed" to Plaintiff's academic failures cannot overcome the more significant facts that Plaintiff repeated both the first and seventh grades (Tr. 192), and that her California Achievement Test ("CAT") scores placed her reading, math, language, and spelling abilities consistently between two and three grade levels below her actual grade (Tr. 192, 195-96). Such school records, as virtually the only evidence of Plaintiff's functioning prior to age 22, show that she did experience the requisite adaptive deficits before age 22. Indeed, such poor school performance of the sort present here "is directly material" to Listing 12.05's requirement of deficits in adaptive functioning during the developmental period. Jackson v. Astrue, 467 F. App'x 214, 218 (4th Cir. 2012); see also Salmons v. Astrue, No.

5:10-CV195-RLV, 2012 WL 1884485, at *7 (W.D.N.C. May 23, 2012) (unpublished) (recognizing that "functional academic skills" represent primary measure of adaptive functioning before age 22); Smith v. Astrue, C.A. No. 3:10-66-HMH-JRM, 2011 WL 846833, at *2 (D.S.C. March 7, 2011) (unpublished) (holding that documentation of scholastic achievement "substantially below grade level . . . demonstrat[ed] that [the plaintiff] portrayed deficits in adaptive behavior during her developmental period"); Watson v. Astrue, 729 F. Supp. 2d 786, 788 (E.D.N.C. 2010) ("The totality of [the] [p]laintiff's school records indicate that deficits in adaptive functioning manifested before the age of 22.").

Moreover, substantial evidence does not support the ALJ's analysis as to Plaintiff's adaptive deficits during the period of alleged disability. Although the ALJ did not make an express finding in that regard, he did make specific findings concerning Plaintiff's work history and daily activities after her 22nd birthday, e.g., that Plaintiff "successfully performed semiskilled work at the substantial gainful activity level for many years," "[was] married, was able to raise a family, help[ed] care for her parents, [and] "[was] able to drive" (Tr. 29), which suggest a conclusion that Plaintiff did not possess adaptive deficits during the period of alleged disability. However, those findings do not sufficiently support the ALJ's implied conclusion that Plaintiff lacked adaptive deficits during the disability period.

17

The ALJ based his finding that Plaintiff "successfully performed semiskilled work at the substantial gainful activity level for many years" (Tr. 29) primarily on Plaintiff's truck driver work from 1992 to 2007 (see id. (citing Tr. 49, 140-41, 148, 153, 197, 200-06, 220; DOT No. 904.383-010, 1991 WL 687703). However, Plaintiff's ability to work during her younger years, prior to the onset of "a physical or other mental impairment imposing an additional and significant work-related limitation of function," 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.05C, has limited relevance to the adaptive deficit inquiry:

> "[T]he fact that a claimant has been able to work in the past does not necessarily suggest that the claimant does not satisfy the deficits in adaptive functioning requirement. . . . 'Listing 12.05(C) assume[s] many, if not most, mildly mentally retarded individuals will be able to work . . . [but that they may] subsequently become disabled due to the development of additional severe impairments.'" Shaw v. Astrue, No. 4:08CV132-D(2), 2009 WL 2486932, at *6-7 (E.D.N.C. Aug. 13, 2009) (unpublished) (quoting Muntzert v. Astrue, 502 F. Supp. 2d 1148, 1158 (D. Kan. 2007)). . . . [An] ALJ thus should take care not to place too much weight on [a claimant's] former work experience in reaching a conclusion . . . as to whether [the claimant] can meet her burden of showing deficits in adaptive functioning as required by . . . Listing 12.05C. See Brooks v. Astrue, No. 2:10CV37D, 2011 WL 3882283, at *8 (E.D.N.C. Aug. 17, 2011) (unpublished), recommendation adopted, 2011 WL 3904104 (E.D.N.C. Sept. 2, 2011) (unpublished).

Nelson v. Astrue, No. 1:09CV117, 2012 WL 37364, at *8 (M.D.N.C. Feb. 3, 2012) (unpublished), recommendation adopted, slip op. (M.D.N.C. Mar. 9, 2012). Thus, without further explanation, Plaintiff's work history does not constitute substantial evidence

18

to support the ALJ's implicit finding that Plaintiff lacked the requisite adaptive deficits during the disability period.

In regards to Plaintiff's daily activities, the ALJ noted that Plaintiff "[was] married, was able to raise a family, help[ed] care for her parents, [and] "[was] able to drive." (Tr. 29 (citing Tr. 48, 50, 160-67, 220, 230, 232-34, 241, 420, 429-30, 443, 459).) However, the ALJ failed to adequately address evidence reflecting Plaintiff's significant difficulty with numerous fundamental daily activities. For example, on a Function Report - Adult - Third Party, Plaintiff's sister indicated that Plaintiff "can't do anything involving reading or writing" (Tr. 161), "can't read the labels" on her medication (Tr. 162), has to have instructions read to her (id.), shops with other people so they can assist her with reading items (Tr. 163), "can't spell out words to write a check or money order" or pay bills (id.), and needs verbal instructions "repeated several times" (Tr. 165). Subsequently, at the hearing, Plaintiff testified that she could read only "some small words" but not a newspaper, that she could not fill out a job application, that she could not write more than her name, and that she obtained a driver's license by taking on oral examination. (Tr. 50.) Further, seven of Plaintiff's former coworkers and supervisors submitted statements attesting to Plaintiff's virtual inability to read any work-related documents and the assistance they provided reading the materials for Plaintiff. (Tr. 200-06.) The ALJ's

failure to consider such significant limitations in Plaintiff's ability to perform daily activities further renders his implicit finding that Plaintiff did not manifest the requisite adaptive deficits during the disability period unsupported by substantial evidence. See Milovanovich v. Colvin, No. 4:12-CV-243-BO, 2013 WL 5962950, at *3 (E.D.N.C. Nov. 7, 2013) (unpublished) (rejecting ALJ's conclusion claimant did not have requisite adaptive deficits where claimant "[was] functionally illiterate," had not ever "performed work involving reading and math," did not "complete[] the function report for her disability application," and needed "her attorney to rephrase and break down several questions . . . during [the] hearing because she did not understand them").

Further, the ALJ erred by finding that Plaintiff did not have another physical or mental impairment imposing significant work-related limitations. (Tr. 29.) Notably, the parties agree (see Docket Entry 11 at 4-5; Docket Entry 15 at 4), and the record definitively establishes, that Plaintiff did suffer from such other impairments. At step two of the SEP, the ALJ labeled as severe Plaintiff's degenerative disc disease, cervical kyphosis, mood disorders, and anxiety-related disorders (Tr. 24), and then (at the RFC stage) limited Plaintiff to medium work with numerous non-exertional limitations (Tr. 30), which precluded her from performing any past relevant work (Tr. 37). See Flowers v. United States Dep't of Health & Human Servs., 904 F.2d 211, 214 (4th Cir.

1990) ("In this circuit, we follow the rule that if a claimant cannot return to [her] past relevant work, [she] has established a work-related limitation of function which meets the requirements of § 12.05(C)."); Wallace v. Astrue, No. 5:09CV359FL, 2010 WL 2520084, at *3 (E.D.N.C. June 21, 2010) (unpublished) ("[T]he 'work-related limitation of function' requirement of § 12.05C is satisfied where a claimant is found to have a 'severe impairment' at step two of the five-part analysis." (citing, inter alia, Luckey v. United States Dep't of Health & Human Servs., 890 F.2d 666, 669 (4th Cir. 1989))). As a result, the Court should conclude that Plaintiff possessed "a physical or other mental impairment imposing an additional and significant work-related limitation of function," Hancock, 667 F.3d at 473 (internal quotation marks omitted).

Finally, the ALJ's reliance on opinion evidence does not amount to substantial evidence to support his conclusion that Plaintiff's borderline intellectual functioning did not meet or equal Listing 12.05C. First, the ALJ relied on consultative examiner Dr. Sullivan's diagnosis of Plaintiff with "borderline intellectual functioning rather than mental retardation" as support for his ultimate conclusion regarding Listing 12.05C. (Tr. 29-30.) However, Dr. Sullivan's report states that he chose Plaintiff's full scale IQ score of 73, to diagnose borderline intellectual functioning: "The claimant's full scale IQ score indicates she was functioning in a borderline range of intelligence." (Tr. 244.) In

contrast, the regulations make clear that, "in cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, [the Commissioner] use[s] the lowest of these in conjunction with [Listing] 12.05." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00D.6.c (emphasis added). Here, Plaintiff's lowest IQ score, her verbal IQ of 70, falls within the range of Listing 12.05C and thus the ALJ should not have relied on Dr. Sullivan's borderline intellectual functioning diagnosis as a basis to find Plaintiff did not meet or equal Listing 12.05C.

Second, the ALJ relied on the state agency consultants' conclusions that Plaintiff's "mental impairments, including her borderline intellectual functioning, were severe but not of listing[] level severity" to support his Listing 12.05C finding. (Tr. 30.) Although both state agency consultants did conclude that Plaintiff's borderline intellectual functioning did not meet or equal any listings (see Tr. 255, 278), neither consultant conducted any specific analysis of the components of Listing 12.05C, i.e., an IQ score of 60 to 70, deficits in adaptive functioning which manifested prior to age 22, and another physical or mental impairment imposing significant work-related limitations (see Tr. 255, 263, 278, 289). In light of the ALJ's legal errors and inadequate explanations regarding his conclusions as to the specific components of Listing 12.05C, the generalized state agency

22

findings in question do not constitute a sufficient basis to support the ALJ's ultimate determination that Plaintiff did not meet or equal Listing 12.05C.

In sum, the ALJ failed to properly address whether Plaintiff met or equaled Listing 12.05C.

## 2. Exclusive Reliance on Medical-Vocational Guidelines

Plaintiff's second and final assignment of error asserts that the ALJ erred by relying exclusively on the Medical-Vocational Guidelines to direct a conclusion of non-disability, where the ALJ also found that Plaintiff suffered from a number of non-exertional limitations. (Docket Entry 11 at 8-9 (citing Hooper v. Heckler, 752 F.2d 83 (4th Cir. 1985), and Grant v. Schweiker, 699 F.2d 189 (4th Cir. 1983).) According to Plaintiff, "[b]eing illiterate and having significant difficulties understanding directions are going to significantly erode the occupational base at any exertional level" and "[t]he ALJ should have consulted a [vocational expert ("VE")] to assess how much these limitations would affect the occupational base and to obtain testimony regarding jobs and their incidence in the economy which would accommodate these admitted limitations." (Id. at 9.) Plaintiff's arguments do not warrant relief.

Where, as in this case, "the claimant reaches step five, the burden shifts to the [Commissioner] to produce evidence that other jobs exist in the national economy that the claimant can perform

23

considering his [or her] age, education, and work experience."
Hunter, 993 F.2d at 35. "The Commissioner may meet this burden by
relying on the Medical-Vocational Guidelines (Grids) or by calling
a [VE] to testify." Aistrop v. Barnhart, 36 F. App'x 145, 146 (4th
Cir. 2002) (citing 20 C.F.R. § 404.1566)).[8] "[W]hen non-exertional
as well as exertional limitations exist, the testimony of a [VE] is
normally required," Hooper, 752 F.2d at 88 (emphasis added);
however, "not every non-exertional limitation . . . preclude[s]
reliance on the Grids," Walker v. Bowen, 889 F.2d 47, 49 (4th Cir.
1989).

Here, the ALJ ruled that, despite Plaintiff's severe
impairments (as found at step two), she retained the RFC to perform
medium work with occasional climbing of ropes, ladders, and
scaffolds and no concentrated exposure to heights and machinery.
(Tr. 30.) The ALJ further found that Plaintiff could understand
and remember simple, three-step directions, sustain attention to
complete simple, routine tasks for two hours at a time, accept
direction from supervisors, maintain relationships with coworkers,
and adapt to changes with stable work assignments, but could not

---

[8] "The Grids categorize jobs by their physical-exertion requirements, namely,
sedentary, light, medium, heavy, and very heavy. There are numbered tables for
the sedentary, light, and medium level (tables 1, 2, and 3, respectively), and
a specific rule for the heavy and very heavy levels. Based on the claimant's
RFC, the ALJ must first determine which table to apply, i.e., if the claimant's
RFC limits him to a sedentary exertional level, then Table No. 1 is the
appropriate table. Next, based on the claimant's age, education, and previous
work experience, the [table or] rule directs a finding of 'disabled' or 'not
disabled.'" Black v. Astrue, No. 3:09CV599, 2010 WL 2306130, at *4 (E.D. Va.
Apr. 26, 2010) (unpublished) (internal citations and footnotes omitted),
recommendation adopted, 2010 WL 2306136 (E.D. Va. June 3, 2010) (unpublished).

handle extensive social interaction or any contact with the general public. (Id.)[9] At step five, the ALJ "consider[ed] [Plaintiff's RFC], age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2." (Tr. 38.) Pursuant to that review, the ALJ observed that, "[i]f [Plaintiff] had the [RFC] to perform the full range of medium work, considering [her] age, education, and work experience, a finding of 'not disabled' would be directed by Medical-Vocational Rule 203.26." (Id.)

The ALJ then recognized that Plaintiff's RFC did not allow for the full range of medium exertional-level work, but instead included certain non-exertional restrictions (i.e., occasional climbing of ropes, ladders, and scaffolds, simple, three-step directions, simple, routine tasks, no extensive social interaction, no contact with the general public); "[h]owever, [the ALJ determined that] the additional limitations have little or no effect on the occupational base of unskilled medium work." (Id.; see also id. ("Social Security Ruling 85-15 states that the basic mental demands of competitive, remunerative, unskilled work include the abilities to understand, carry out and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting on a sustained basis (i.e., 8 hours a day, 5 days a

---

[9] Plaintiff's brief does not contend that the record lacks substantial evidence supporting the ALJ's RFC finding. (See Docket Entry 11 at 4-9.)

week, or an equivalent work schedule). . . . [Plaintiff] has retained the ability to meet these basic mental demands on a sustained basis. Social Security Ruling 85-15 also provides that restrictions against unprotected elevations and proximity to dangerous, moving machinery are not significant at any exertional level. Finally, Social Security Ruling 83-14 indicates that the inability to ascend or descend ladders or scaffolding is not significant.").) Given that determination (and without testimony from a VE), the ALJ concluded that "[a] finding of 'not disabled' [wa]s therefore appropriate under the framework of [Medical-Vocational Rule 203.26]." (Id.)

Abundant authority supports the ALJ's conclusion that Plaintiff's non-exertional limitations did not erode the occupational base of medium, unskilled work. See, e.g., Cooper v. Secretary of Health & Human Servs., No. 86-3514, 843 F.2d 1390 (table), 1988 WL 27503, at *1, 5 (6th Cir. Mar. 31, 1988) (unpublished) (holding that "ALJ was justified in relying upon the grids," where ALJ "observed that claimant retained the [RFC] to perform simple and repetitive sedentary work of a low-stress type"); Smith v. Colvin, No. 3:13CV570MOC, 2014 WL 2159122, at *4 (W.D.N.C. May 23, 2014) (unpublished) ("The ALJ concluded [the] plaintiff could do medium unskilled work with limited public contact. . . . The ALJ reasoned [that] unskilled work usually involves working with things and not the public, a finding which

26

finds support in the regulations and case law within the Fourth
Circuit. . . . The ALJ was not obligated to bring in a VE and
properly relied on the Grids in finding [the] plaintiff not
disabled." (internal citation omitted)); Livingston v. Colvin, No.
3:13CV233MOC, 2014 WL 496484, at *6 (W.D.N.C. Feb. 6, 2014)
(unpublished) ("Plaintiff argues that the ALJ finding that her RFC
for light work was limited to SRRTs prevented the ALJ from relying
on the Grids in determining whether work existed in significant
numbers in the national economy that she could perform. . . . A
limitation to SRRTs does not prevent an ALJ from relying on the
Grids."); Scott v. Colvin, No. 1:12CV170RJC, 2013 WL 3927607, at
*6-7 (W.D.N.C. July 29, 2013) (unpublished) (rejecting argument
"that the ALJ should have consulted a [VE] to support [the] step-
five determination . . . [where] [t]he ALJ determined that [the]
[p]laintiff does suffer from mental health impairments . . .
accounted for in the ALJ's RFC determination by restricting [the]
[p]laintiff to the performance of non-complex, repetitive and
routine tasks in a low stress, non-production environment that does
not involve significant interpersonal interaction . . . [because]
limitation to simple, unskilled, entry level work that allows for
less stress work without public contact or significant interaction
with others would not significantly erode the occupational base
represented by the Grids" (internal quotation marks omitted));
Lewandowski v. Astrue, No. 1:07CV1777DLB, 2008 WL 4736788, at *8

27

(E.D. Cal. Oct. 28, 2008) (unpublished) ("[T]he ALJ determined that [the] [p]laintiff could perform a significant number of jobs in the national economy.   In this regard, he determined that her non-exertional limitation to simple, routine tasks had little or no effect on the occupational base of unskilled light work.   The ALJ was entitled to make this determination." (internal citation omitted)); Social Security Ruling 85-15, Titles II and XVI: Capability to Do Other Work – The Medical-Vocational Rules as a Framework for Evaluating Solely Nonexertional Impairments, 1985 WL 56857, at *4, 8 (1985) (limits to unskilled work and no heights or moving machinery do not erode occupational base); Social Security Ruling 83-14, Titles II and XVI: Capability to Do Other Work – The Medical-Vocational Rules as a Framework for Evaluating a Combination of Exertional and Nonexertional Impairments, 1983 WL 31254, at *5 (1983) (preclusion of ascending or descending ladders and scaffolds does not erode medium occupational base).

Plaintiff nevertheless maintains that the ALJ erred because he did not expressly consider the effect that her illiteracy had on the medium occupational base.   (See Docket Entry 11 at 9; see also Tr. 38.)   However, as the Commissioner correctly argues, "[t]he Grid[s] explicitly account[] for illiteracy" and thus "illiteracy is not a non-exertional impairment" that can erode the occupational base.   (See Docket Entry 15 at 18 (citing Wolfe v. Chater, 86 F.3d 1072, 1078 (11th Cir. 1996), and 20 C.F.R. Pt. 404, Subpt. P, App'x

2, Rules 201.23, 202.16)); <u>see also</u> 20 C.F.R. Pt. 404, Subpt. P, App'x 2, Rules 201.00(i), 202.00(g) (providing that "the primary work functions in the bulk of unskilled work relate to working with things (rather than with data or people) and in these work functions at the unskilled level, literacy or ability to communicate in English has the least significance" and that the capability for sedentary and light work reflects "substantial vocational scope" for claimants aged 18 to 49 even if "illiterate or unable to communicate in English"); 20 C.F.R. Pt. 404, Subpt. P, App'x 2, Rule 203.00 ("The functional capacity to perform medium work includes the functional capacity to perform sedentary, light, and medium work.").

In conclusion, Plaintiff has not shown prejudicial error arising out of the ALJ's exclusive reliance on the Grids to direct a conclusion of non-disability.

### III. CONCLUSION

Plaintiff has established an error warranting remand.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be reversed and that the matter be remanded under sentence four of 42 U.S.C. § 405(g), for further administrative proceedings to include reevaluation of whether Plaintiff's intellectual functioning meets or medically equals the requirements of Listing 12.05C. As a result, Plaintiff's Motion for Judgment on the Pleadings (Docket Entry 10) should be granted

to the extent it seeks remand, and Defendant's Motion for Judgment
on the Pleadings (Docket Entry 14) should be denied.


                                    /s/ L. Patrick Auld
                                 **L. Patrick Auld**
                        **United States Magistrate Judge**

January 11, 2016